# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL CASE NO. 3:21-cv-00315-MR

| | | |
|---|---|---|
| CALVIN JEROME WOMIC, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| FNU CORTEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, [Doc. 38]; Defendant's Motion to Seal Document, [Doc. 39]; Plaintiff's "Motion" Reply to Defendant's Motion for Summary Judgment, [Doc. 44]; and Defendant's Motion for Leave to File Out-of-Time Alternative Reply, [Doc. 45].

## I.    PROCEDURAL BACKGROUND

On July 1, 2021, Plaintiff Calvin Jerome Womic, Jr., ("Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 for the violation of his Fourteenth Amendment right to be free from the use of excessive force that amounts to punishment.  [Doc. 1].  Plaintiff's unverified Complaint survived initial review against Defendant FNU Cortez, identified as a Deputy at the Gaston County Sheriff's Office, in his individual and official

capacities.[1]  [Doc. 9].  Plaintiff alleged the following.  On May 10, 2021, between 11:00 p.m. and 12:45 a.m. the next day, at B-Block at Gaston County Jail (the "Jail"), Plaintiff was involved in an altercation with "multiple Jail staff."  After Plaintiff was subdued on the ground and without resisting or acting aggressively and with his right hand in handcuffs, Defendant Cortez allowed his dog, Shady, to attack Plaintiff on Plaintiff's hip.  While Plaintiff's right arm remained in handcuffs, Defendant Cortez repositioned Shady to bite Plaintiff's upper left arm.  Then Defendant Cortez repositioned Shady again to attack Plaintiff's lower left arm.  [Doc. 1 at 4-5].  Plaintiff had to go to a local hospital for treatment an hour after the incident.  His left arm had a "huge gash" and he had to get 24 staples. Plaintiff suffered "massive nerve damage" and he experiences numbness "all the way down to [his] pinky [and] ring finger[s]."  [Id. at 5].

On August 7, 2022, Defendant moved for summary judgment and to seal certain Exhibits submitted in support of his motion.  [Docs. 38, 39].  Defendant argues that summary judgment should be granted because

---

[1] The remaining Defendants and Plaintiff's remaining claim were dismissed for the reasons stated in the Court's initial review Order.  [Doc. 9 at 5].  The materials submitted by Defendant FNU Cortez in support of his summary judgment motion show that his true full name is Francisco Cortez.  [See Doc. 38-4 at 7, Doc. 38-8 at ¶ 5].  The Court will instruct the Clerk to update the docket accordingly.

"irrefutable video footage shows" that, as a matter of law, there was no use of excessive force. [Doc. 41 at 3]. Defendant also argues that qualified immunity bars Plaintiff's claim against him. [Id. at 4]. In support of his summary judgment motion, Defendant submitted a brief; his own Affidavit; the Affidavits of Sergeant Grooms, Corporal Truesdale, Deputy Robinson, Deputy Linkous, District Attorney Travis G. Page, and Captain Alan Cranford, identified as an expert; and video footage and still pictures of the incident. [Docs. 38, 38-1 to 38-8].

Thereafter, on August 19, 2022, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 43]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers,

or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))]. Plaintiff responded to Defendant's motion, but apparently before having received the Court's Roseboro Order. [See Docs. 44, 44-1]. Plaintiff's response, which the Clerk docketed as a "motion" consistent with the document's caption, was not submitted under penalty of perjury. In it, Plaintiff more fully sets out his alleged injuries and claimed damages and seeks to counter some of Defendant's evidence.[2] [Doc. 44]. As noted, Plaintiff's Complaint was not verified or otherwise submitted under penalty of perjury and, therefore, also cannot be considered for its evidentiary value here. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (holding that a district court is to consider verified prisoner

---

[2] Defendant moves for leave to file an "out-of-time" reply to Plaintiff's response. [Doc. 45]. Defendant argues that he was unaware of the possibility that the "motion" may be considered a response and asks for leave to file a belated reply to it. [Id. at 2]. The Court will grant this motion and has considered Defendant's Reply, [Doc. 46].

complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge"). Thus, in terms of evidentiary forecast, the Defendant's is unrefuted.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

In making this determination, the Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." Matvia v. Bald Head Island Mgt., Inc., 259 F.3d 261, 266 (4th Cir. 2001).

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

5

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

If this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n. 3. In so doing, the nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to

the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. <u>Id.</u> at 380. Where the record contains an unchallenged videotape capturing the events in question, the court must only credit a party's version of the facts to the extent it is not contradicted by the videotape. <u>Id.</u>

## III. FACTUAL BACKGROUND

Defendant has shown the following forecast of evidence through sworn testimony.

Defendant Cortez is a Deputy Sheriff employed by the Sheriff of Gaston County as a K9 Officer. [Doc. 38-5 at ¶ 1: Cortez Aff.]. Defendant Cortez successfully completed K9 officer training as required by the Sheriff and the State of North Carolina. [<u>Id.</u> at ¶ 3]. On May 10, 2021, Defendant Cortez was current on all Sheriff Deputy and K9 officers training required by the State of North Carolina and the Gaston County Sheriff. [<u>Id.</u> at ¶ 4]. Defendant Cortez has been Shady's K9 handler for Shady's entire career,

which began in 2019. Shady received extensive training by a certified trainer before his service began and he was current on all required training as of May 10, 2021. [Id. at ¶ 5].

Between March 31, 2020, and May 10, 2021, Plaintiff had roughly 40 incident reports filed against him while incarcerated at the Gaston County Jail. [Doc. 38-1 at ¶ 14: Groom Aff.]. Some of these incidents involved fighting with and assaulting other inmates, disruptive behavior, refusal to follow commands, property damage, and threatening officers. [See id.].

On May 10, 2021, after "all-quiet hours," Defendant Cortez was working in the Jail with Shady, his assigned K9, and wearing his distinct dark green K9 officer uniform. [Doc. 38-5 at ¶¶ 9, 11]. At around 11:20 p.m., Defendant Cortez and Shady were in Central Control when Cortez heard Corporal Truesdale radio for assistance in B-Block because an inmate had been hitting his cell door. [Id. at ¶ 10]. Defendant Cortez and Shady ran to B-Block with other officers in response to Corporal Truesdale's radio call. [Id. at ¶ 12].

Once in B-Block, Defendant Cortez positioned himself with Shady in front of Plaintiff's cell door where Cortez believed he and Shady would have been clearly visible to the inmates in the cell, one of whom was Plaintiff. [Id.]. Defendant Cortez saw an inmate's face at the door and the inmate appeared

8

to be looking at Defendant Cortez and Shady. [Id.]. At this time, Defendant Cortez did not know the identity of the inmate. [Id.]. Defendant Cortez observed Corporal Truesdale at the cell door and heard Truesdale give the inmate at the door, later learned to be Plaintiff, several commands to go to the back of his cell or he would be sprayed with pepper spray. [Id. at ¶¶ 14-15]. Defendant observed Plaintiff failing to follow these commands. [Id. at ¶ 16]. Plaintiff was yelling and clearly upset about events that had transpired earlier in the day.[3] Defendant Cortez heard Plaintiff use fighting words, saying he, Plaintiff, "was ready to go." [Id. at ¶ 17]. Defendant Cortez recognized the security risk presented by Plaintiff's disruptive behaviors after hours in the cell block, which "was heightened by Plaintiff's failure to follow commands to stop, then escalated when he refused commands to step to the back of the cell." [Id. at ¶ 18].

Defendant Cortez then observed one of the jailers open Plaintiff's cell door. As Corporal Truesdale attempted to administer pepper spray, Plaintiff punched Truesdale in his head. [Id. at ¶ 19]. Plaintiff exited the cell and began assaulting multiple officers. [Id. at ¶ 20]. Corporal Truesdale fell to the ground. [Id. at ¶ 20]. Defendant Cortez quickly assessed the situation,

---

[3] Plaintiff and his cell mate were locked down earlier in the evening during laundry exchange for possessing "hooch" in their cell. [Doc. 38-3 at ¶ 4: Murphy Aff.].

9

"immediately recognized the continuing escalation into the cell block," and determined that Plaintiff posed a direct and immediate threat to the safety of other officers. [Id. at ¶ 21]. Defendant Cortez quickly approached to deploy Shady to bring Plaintiff under control through a "bite and hold" technique for which Shady was trained. [Id. at ¶ 22]. Defendant Cortez announced "'Dog! Dog! Dog!' or words to that effect" and he and Shady ran toward Plaintiff. [Id. at ¶ 23]. Defendant Cortez also heard fellow K9 officer Deputy Robinson issue loud verbal commands to warn Plaintiff and to have others step back for Shady. [Id. at ¶ 24]. With Shady on a leash and under Defendant Cortez' control, Cortez deployed Shady, who immediately performed as trained to take Plaintiff to the ground and fix on Plaintiff's left arm. [Id. at ¶ 25]. Defendant Cortez perceived Plaintiff as a continued threat until Plaintiff was fully handcuffed due to Plaintiff's combativeness and assault on officers. [Id. at ¶ 26]. After Shady's bite, Plaintiff stopped fighting and resisting and gave up his hands for handcuffing. At this point, Plaintiff was no longer a threat. [Id. at ¶ 27]. Once compliance was obtained, Plaintiff called Shady to stand down. Shady obeyed Defendant Cortez' command without hesitation, released Plaintiff, and returned to Defendant's side. Other officers then secured Plaintiff. [Id. at ¶ 28].

Plaintiff was charged with Assault on a Government Official because of his conduct in this altercation. [Id. at ¶ 36]. This charge, however, was dismissed due to multiple unsuccessful attempts to transport Plaintiff from North Carolina Department of Public Safety (NCDPS) custody to Gaston County for court and not for lack of probable cause.[4] [Doc. 38-7 at ¶ 11: Page Aff.].

Defendant also presents a statement from Captain Alan Cranford, a proposed law enforcement expert and former K9 officer. [Doc. 38-8 at ¶¶ 1-2: Cranford Aff.]. In reaching an opinion in this matter, Cranford interviewed Defendant Cortez and the other officers involved in the incident, reviewed the Gaston County Jail use of force policy (the "Policy") and the pertinent pleadings, viewed the video footage of the incident, visited the Jail's B-Block and control room, and met and interacted with Shady. [Id. at ¶¶ 5-7, 10]. Cranford opines that Defendant Cortez followed the Policy in the subject encounter with Plaintiff and that Defendant Cortez' use of force was

---

[4] On November 5, 2021, Plaintiff pleaded guilty to the charges for which he was detained at the Gaston County Jail. He was later sentenced to a term of 21 to 35 months and transferred to NCDPS custody on January 3, 2022. [Doc. 38-7 at ¶¶ 9-10].

reasonable and appropriate under the circumstances.[5]  [Id. at ¶¶ 7, 9].

Cranford also opines that the "bite(s) and hold method is an acceptable and

proper use of force by K-9's and the passage of 10-12, or up to 14 seconds

as reflected by video footage is not an unreasonable … length of time under

the circumstances."  [Id. at ¶ 24(d)].

Some of the above-described forecast of evidence, however, is

unsupported or uncorroborated by the uncontroverted video evidence.  The

relevant forecast of video evidence shows, in pertinent part, the following.[6]

[See Doc. 38-1, Exs. A-C]. At approximately 11:20 p.m., Corporal Truesdale

approached Plaintiff's cell after Plaintiff had been beating on his cell door

and told the Plaintiff to "quiet down" and "don't hit that door again like that"

or "you'll get sprayed."  Plaintiff audibly – though indiscernibly – responded

and Corporal Truesdale replied, "okay." Corporal Truesdale then stepped

away from the cell and radioed for officer assistance in B-Block, explaining

"I've got one beating. I've already warned him multiple times so."  Corporal

---

[5] The Court notes that Defendant did not provide a copy of the Policy in support of his summary judgment motion. Moreover, there is no forecast of evidence the existence of substance of any policies related to or governing the use of K9s at the Jail.

[6] The identity of the some of the officers depicted in the video footage is derived from the Affidavits submitted by Defendant, as indicated.  The video footage includes footage taken from two B-Block cameras, which have no sound, and footage from the Body Worn Cameras (BWCs) of Corporal Truesdale and Officer Murphy, which do have sound.  [Doc. 38-1 at ¶¶ 4-6: Groom Aff.].

Truesdale then returned to Plaintiff's cell door, with his body camera facing toward Plaintiff, and stated rhetorically, "You gonna ball your fist up too?" Corporal Truesdale then waited at Plaintiff's cell door for other officers to arrive. Officer Murphy arrived first. Corporal Truesdale told Officer Murphy that, "he's got his fists balled up too" and that "he says he's ready to go." At this point, Corporal Truesdale had not ordered Plaintiff to go to the back of his cell.

Nine other officers then approached, including Defendant Cortez with Shady. Defendant Cortez and another officer, presumably Deputy Robinson, the other K9 Officer, were dressed in dark green uniforms. Another unidentified officer was dressed in what appears to be an all-black uniform. The remaining eight officers were dressed in khaki-colored tops and dark green- or dark gray-colored pants. There was an officer standing between Defendant Cortez (with Shady) and Plaintiff's cell, such that Plaintiff's view of Defendant Cortez and/or Shady may have been at least partially obstructed. Plaintiff cannot be discernably understood to say "I'm ready to go," even though Corporal Truesdale repeated this to Officer Murphy. Because of the position of the cameras, the video also does not show Plaintiff balling a fist or showing any aggressive movements or mannerisms.

Once the other officers arrived at Plaintiff's cell, Corporal Truesdale readied himself, holding a canister of pepper spray with his right hand. At this point, Corporal Truesdale can be heard saying "back up," but it appears this was directed at Officer Murphy, not to the Plaintiff. Corporal Truesdale aimed the pepper spray canister toward and within a couple inches of the seam of Plaintiff's cell door. Officer Murphy reached for the door handle with his left hand, standing with his back against the door, ready to open it. Plaintiff can be seen pressing his body against the cell door window at this time. Officer Murphy opened the door and Corporal Truesdale immediately deployed pepper spray to Plaintiff's facial area. Plaintiff very quickly reached up with his left hand, pulling Corporal Truesdale's right arm down, and struck Corporal Truesdale in the face with his right fist. Meanwhile, very shortly after the cell door opened, Shady moved suddenly toward Plaintiff, which appeared to catch Defendant Cortez off guard. Defendant Cortez appears to be actively holding Shady back from intervening until Shady made his way to the Plaintiff. When Plaintiff exited the cell, he crouched and flailed so as to avoid the officers' grasps. Plaintiff appears to have either lost his balance or been pushed and stumbled forward. Shady's first contact with Plaintiff occurs when Plaintiff was already falling to the floor. Approximately five to six seconds elapsed between the time Plaintiff struck Corporal Truesdale

14

and the moment Shady first physically contacted Plaintiff. Shady immediately latched onto Plaintiff's left hip. Plaintiff's right arm was wrapped around his head in what appears to be a protective mode and his left arm was down by his side or under his body. Plaintiff can be seen on his side and stomach, writhing on the ground, ostensibly to escape Shady's bite and/or in response to pain from the bite. On the audio, Plaintiff can be heard yelping in pain. The view of Plaintiff and Shady's movements then becomes obscured by officers converging on them. Nonetheless, Shady appears to be actively biting or latched onto Plaintiff until, after approximately 15 seconds from first bite, Defendant Cortez can be seen pulling Shady backwards from the Plaintiff. Although sounds of commotion and Plaintiff's yelping can be heard on the BWC footage, the Court cannot discern whether any warning of "Dog! Dog! Dog!" or similar language was made by Defendant Cortez or anyone else at any time during the video.

## IV.   DISCUSSION

Defendant claims that qualified immunity bars Plaintiff's claim. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the

court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

The Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). To state an excessive force claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015).

The standard for assessing a pretrial detainee's excessive force claim is "solely an objective one." Id. In determining whether the force was objectively unreasonable, a court considers the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Graham, 490 U.S. at 396). Considerations that bear on the reasonableness or

unreasonableness of the force include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. Id. Graham's general reasonableness standard governs review of excessive force claims involving police dogs. Godbold v. Hammons, No. 6:16-CV-06073, 2018 WL 10560770, at *6 (W.D. Ark. Oct. 19, 2018) (citations omitted).

It is clearly established in the Fourth Circuit that "failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment." Vathekan v. Prince George's Cnty., 154 F.3d 173, 178 (4th Cir. 1998); Kopf v. Wing, 942 F.2d 265, 268 (4th Cir. 1991).

Defendant argues that he is entitled to qualified immunity because the uncontroverted evidence shows that his conduct did not violate Plaintiff's constitutional rights, particularly that he did announce a warning before deploying the dog. [Doc. 41 at 21]. However, after careful review of the video footage, together with consideration of Defendant's remaining forecast of evidence, the Court concludes that there remains a genuine issue of material fact for trial on the issue of whether excessive force was employed.

17

A reasonable jury could find that the use of force on Plaintiff by Defendant Cortez through Shady was objectively unreasonable under the circumstances. Plaintiff was a single individual banging his cell door during quiet hours. Ten officers, including Defendant Cortez, responded to Corporal Truesdale's request for assistance to gain Plaintiff's compliance. All eleven officers gathered outside of Plaintiff's cell door. There is no forecast of evidence that Plaintiff was armed or that Defendant Cortez was aware that Plaintiff posed any particular threat or security concern. It is uncontroverted that Plaintiff threw a punch at Corporal Truesdale after Truesdale deployed pepper spray to Plaintiff's face. While Plaintiff appeared to offer some resistance as he exited his cell, he did not appear to strike or attempt to strike any other officers. Rather, Plaintiff was crouched over, and it appears that Plaintiff's momentum, with or without force applied by the other officers, propelled him to the floor. Although Defendant Cortez claims that he yelled, "Dog! Dog! Dog!" in warning before Shady attacked Plaintiff, the audio from the incident does not appear to support this. Moreover, only approximately five to six seconds elapsed from the moment Plaintiff struck Corporal Truesdale to the moment Shady contacted Plaintiff. A reasonable jury could disbelieve that Defendant Cortez witnessed Plaintiff strike Corporal Truesdale, appreciated the relative threat of this action, decided to deploy

Shady, yelled "Dog! Dog! Dog!" in warning, and deployed Shady, all within five seconds, giving Plaintiff the opportunity to react and comply. Moreover, and in any event, the forecast of video evidence does not support that Plaintiff was given any chance to surrender after any purported warning was given and before Shady was deployed.

Rather, a jury could find that Shady immediately lunged for the Plaintiff when Plaintiff struck Corporal Truesdale, catching Defendant Cortez off guard, and that Defendant Cortez ultimately had to physically remove Shady from the Plaintiff. While Shady may have reduced the time necessary to subdue Plaintiff after his cell door was opened, the evidence could be understood to reflect that no effort was made to temper the amount of force that was used on Plaintiff. Moreover, the relative duration of Shady's grasp on Plaintiff, given that Plaintiff was face down on the ground while Shady was engaged, could be seen as negating the objective reasonableness of the force used.[7] Finally, Defendant's forecast of testimonial evidence appears to be inconsistent with the video evidence regarding whether

---

[7] There is no forecast of evidence of the extent of Plaintiff's injuries in a form acceptable on summary judgment. The Court, therefore, does not consider the extent of Plaintiff's injuries in assessing the reasonableness of the force used under the Fourteenth Amendment. See Kingsley, 576 U.S. at 397 (citation omitted).

Plaintiff was warned before Shady's deployment, whether Plaintiff was ever ordered to go to the back of his cell in the first place or whether Plaintiff said anything to the effect of being ready to fight.

In short, notwithstanding the fact that Plaintiff presented no counter forecast of evidence, the forecast of evidence presented by Defendant does not sufficiently support a finding as a matter of law that the force used by Defendant Cortez was objectively reasonable under the circumstances. Moreover, while the video evidence regarding Defendant Cortez' control over Shady may arguably be consistent with a proper application of the "bite and hold" technique, the forecast of evidence on this issue is insufficient to take the determination of objective reasonableness from the jury.[8]  Given the existence of these factual issues as to whether a constitutional violation

---

[8] Plaintiff's official capacity claim against Defendant, however, fails. Suits against an officer in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099 (1985) (quoting Monell v Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 (1978)).  The Office of Sheriff is not liable under § 1983 for an employee's acts "unless action pursuant to official municipal policy of some nature caused [the] constitutional tort."  Collins v. City of Harker Heights, 503 U.S. 115, 120-21, 112 S.Ct. 1061, 1066 (quoting Monell, 436 U.S. at 691, 98 S.Ct. at 2036).  That is, "[f]or a governmental entity to be liable under section 1983, the official policy must be the moving force of the constitutional violation."  Moore v. City of Creedmoor, 345 N.C. 356, 366, 481 S.E.2d 14, 21 (1997) (internal quotation marks and citations omitted).  There is no forecast of evidence here that any official policy or custom played a part in the alleged constitutional violation.  The Court, therefore, will dismiss this claim.

occurred, the Defendant is not entitled to qualified immunity, and his motion for summary judgment must be denied.

## V.    DEFENDANT'S MOTION TO SEAL

Defendant Cortez, through counsel, moves the Court to seal Exhibits A, B, C, and D to the Affidavit of Sergeant Grooms, which were manually filed on a flash drive under seal in support of Defendant's Motion for Summary Judgment.  [Doc. 39; <u>see</u> Doc. 42].  Defendant provides that, pursuant to N.C. Gen. Stat. § 132-1.7(a1), the Sheriff of Gaston County has determined it is inappropriate to disclos[e] video or photographs which show the footage of the interior of the detention facility to the public."  [Doc. 38 at ¶ 7].  Before sealing a court document, the Court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." <u>Ashcraft v. Conoco, Inc.</u>, 218 F.3d 288, 302 (4th Cir. 2000).  In the present case, the public has been provided with adequate notice and an opportunity to object to the Defendant Cortez's motion.  Defendant filed his motion in August 2022, and it has been accessible through the Court's electronic case filing system since that time.  Moreover, the public's right of access to images

21

and videos depicting the interior of the Jail is substantially outweighed by security risks inherent in publishing that information. Having considered less drastic alternatives to sealing these Exhibits, the Court concludes that sealing these records is necessary to protect the implicated privacy interests. As such, the Court will grant Defendant Cortez's motion to seal and order that Exhibits A through D remain under seal. [See Doc. 42].

## VI. CONCLUSION

For the reasons stated herein, the Court will deny Defendant's motion for summary judgment, grant Defendant's motion to seal, and grant Defendant's motion to file an alternative out-of-time reply.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 38] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's official capacity claim against Defendant Cortez is hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Seal [Doc. 39] and Defendant's Motion for Leave to File Alternate Reply Out-of-Time [Doc. 45] are **GRANTED**.

The Clerk is instructed to substitute the true full name of Defendant FNU Cortez as Francisco Cortez in the docket in this matter.

22

The Clerk is also respectfully instructed to term the motion at Docket No. 44.

**IT IS SO ORDERED**.

Signed: January 23, 2023

Martin Reidinger
Chief United States District Judge